**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____
                                 :

SEAN ZUNGOLI,                     :

                                 :

                                 :

                 Plaintiff,      :        Civ. Action No. 07-2194 (SDW)

                                 :

                                 :

        v.                      :

                                 :        **OPINION**

                                 :

UNITED PARCEL SERVICE, INC. and :
CHRIS SITTIG, Individually,      :        April 22, 2009

                                 :

                                 :

                 Defendants.     :
_____ :

**Wigenton**, District Judge

        Before the Court is Defendants', United Parcel Service, Inc. ("UPS") and Chris Sittig's ("Sittig") (collectively "Defendants"), Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(c). The Court has jurisdiction pursuant to 28 U.S.C. § 1332(2).  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Venue is proper pursuant to 28 U.S.C. § 1391(b). The Court, having considered the parties' submissions, decides this matter without oral argument, pursuant to Fed. R. Civ. P. 78. For the reasons stated below, this Court **denies** in part and **grants** in part Defendants' Motion for Summary Judgment.

**Facts**

On May 15, 1989, Plaintiff Sean Zungoli ("Plaintiff") was hired by UPS. By 1997, after his second promotion, Plaintiff was promoted to two-unit Senior Telecom Engineer.

From May 2001 until August 2001, Plaintiff took Family Medical Leave Act ("FMLA") leave. Before Plaintiff left on medical leave, he was a manager and Charlene Troyano reported to him. Upon his return from medical leave, Charlene Troyano was Plaintiff's manager.[1] Plaintiff's Quality Performance Review ("QPR") score for the first half of 2001 was 102.8; in the second half of 2001 it was 99.5.[2]

In 2002, Plaintiff's supervisor acknowledged that Plaintiff had a tough year in 2001. Plaintiff's supervisor analogized Plaintiff's situation to that of employees who go on maternity leave and as a consequence their career progress remains status quo. In the spring of 2002, Plaintiff received a salary increase of 2%; in prior years his salary increase was 5%.

In January 2004, Plaintiff took additional FMLA leave. Approximately six months after he returned, and after twelve years in the Wireless Operations Group, Plaintiff was transferred to the Server Programming Support Group.

In 2005, Plaintiff was transferred to the Vehicle Communications Group. Plaintiff's QPR score for the first half of 2005 was 101. His QPR score for the second half of 2005 was 100.6. In April 2005, a list of "Potentially Over-Compensated" employees was created at a "peer meeting" attended by John Killeen ("Killeen"), head of

---

[1] Plaintiff also alleges that no one could tell him why this change was made and Ms. Troyano was also displaced after she took medical leave in 2004.
[2] UPS considers a score of 100-103 to be an above average QPR score.

2

Global Network Systems Group, Mike Turner ("Turner"), John Jamin ("Jamin")[3], and Sittig. Killeen created the list of "Potentially Over-Compensated" employees. Plaintiff was included on the list of "Potentially Over-Compensated" employees with a notation that he had very difficult health problems.

In January 2006, Plaintiff was placed on the "Less Than Expected" list. Both Sittig and Jamin attributed Plaintiff's being placed on the "Less Than Expected" list to Plaintiff receiving a merit increase lower than his peers. Sittig also noted that Plaintiff was placed on the list because Plaintiff's current skills would not allow him to succeed in his current position.

Also in January 2006, Plaintiff voiced concerns that UPSer.com did not provide adequate security to protect UPS employees' personal information. UPS disclaimed any responsibility related to the privacy of its employees' personal information on UPSer.com.

In February 2006, Plaintiff was transferred to the Enterprise Telephony Services Group ("ETS"); Sittig became Plaintiff's direct supervisor.

Sittig asked Plaintiff to complete three major projects in 2006; Plaintiff admits that he failed to perform any of these three projects satisfactorily. Sittig created a forty page "coaching file" to reflect Plaintiff's performance and coached Plaintiff on issues such as: failing to meet deadlines; reviewing the wrong information in his analysis; omitting information from meeting recap notes; not properly outlining his research; and failing to notify management in a timely manner about his completion of the annual workplace survey.

---

[3] Neither Turner's nor Jamin's titles with UPS have been provided to the Court.

In May 2006, UPS replaced its QPR system with the Talent Management System ("TMS"). Plaintiff's concerns regarding TMS were similar to those expressed regarding UPSers.com. Plaintiff was concerned that specific identifying information, *i.e.* educational background, would not be protected. Also in May 2006, Defendant Sittig, suggested, to management, meeting with Human Resources to discuss taking disciplinary action against Plaintiff for failing to register to UPSer.com and TMS.

In or about late June or early July 2006, Jamin learned that Plaintiff was on the "Less Than Expected" list. Jamin concedes that Plaintiff's placement on the list played a role in Jamin's determination that Plaintiff should be terminated.

In August 2006, Defendant Sittig rated Plaintiff a 3 out of 6 on Mission Skills. Sittig asserted that this rating was due to Plaintiff's failure to register for UPS portals, Direct Deposit, and Payroll Advance Notices.

On October 23, 2006, UPS management, including: Sittig, his boss John Jamin, and Jamin's boss, Mike Turner, met with manager John Killeen (Turner's boss) and made a preliminary decision to offer Plaintiff a choice of: 1) a performance improvement plan ("PIP"); or 2) a demotion. However, Killeen instructed that management must first consult UPS' Human Resources Department before implementing either option.

On November 15, 2006, Human Resources Manager Carol Preus provided the "coaching file" to Lamar Stockman, the Mahwah, New Jersey facility's Human Resources Manager. Stockman opined that Plaintiff's performance had not improved, despite repeated efforts to coach and correct Plaintiff's deficiencies. Stockman recommended that Plaintiff be terminated.

On November 16, 2006, UPS management (Turner, Jamin, Sittig, Stockman, and Preus) met and ultimately decided to terminate Plaintiff.

On the same date, Plaintiff -- after reviewing Sittig's Outlook calendar[4] -- left Sittig a voicemail stating that he was not feeling well and was therefore leaving for the day. On November 17, 2006, Plaintiff's wife contacted UPS' short term disability insurance carrier to request FMLA leave on Plaintiff's behalf.

In a letter dated November 17, 2006, Sittig asked Plaintiff to contact him no later than Tuesday, November 21, 2006. Plaintiff did not contact Sittig and via telephone on November 21, 2006, he was advised by Sitting, and HR representative Gail Stokes that his employment was terminated.

Plaintiff filed an Amended Complaint ("Complaint") against Defendants on December 13, 2007, alleging: 1) Count One – Retaliation in violation of the Conscientious Employee Protection Act ("CEPA"); 2) Count Two – Retaliation for taking intermittent Family Medical Leave Act ("FMLA") leave prior to November 2006; 3) Count Three – Retaliation/Failure to Reinstate Plaintiff after his November 2006 FMLA leave; and 4) Count Four – Age discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD").

On December 12, 2008 Defendants filed the instant Motion for Summary Judgment, seeking to dismiss Plaintiff's Complaint in its entirety, asserting: 1) Plaintiff's CEPA claim fails as a matter of law; 2) Plaintiff's FMLA retaliation claim concerning his 2001 and 2004 FMLA leaves is meritless; 3) there is no evidence that UPS discharged Plaintiff due to any FMLA request in 2006; 4) Plaintiff's age discrimination claim is baseless; 5) Plaintiff's individual claims against Sittig should be dismissed; or 6) in the

---

[4] Sittig's Outlook Calendar reflected a meeting of UPS management to discuss terminating Plaintiff.

alternative, Defendants seek to strike Plaintiff's claim for economic damages because Plaintiff spoiled evidence of mitigating factors.

**LEGAL STANDARD**

**Summary Judgment**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sheilds v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). The court may not weigh the evidence and determine the truth of the matter but rather determine whether there is a genuine issue as to a material fact. *Anderson*, 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 520 (1991).

**DISCUSSION**

**CEPA**

To establish a *prima facie* case of CEPA retaliation, a plaintiff must allege

sufficient facts to evidence that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy;
>
> (2) he or she performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19-3c;
>
> (3) an adverse employment action was taken against him or her; and
>
> (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Dzwonar v. McDevitt,* 177 N.J. 451, 462 (2003).  Additionally, "the trial court must make

a threshold determination that there is a substantial nexus between the complained-of-

conduct and a law or public policy identified by the court or the plaintiff."  *Id.*  If the

court finds that there is such a nexus, it is for a jury to determine "whether the plaintiff

actually held such a belief, and if so, whether that belief was objectively reasonable."  *Id.*

at 464-65.

Here, Plaintiff alleges: 1) that he believed that UPS and Sittig were violating

either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public

policy; 2) he performed a whistle-blowing activity as defined by N.J.S.A. 34:19-3(c); 3)

an adverse employment action was taken against him; and 4) a causal nexus exists between the whistle-blowing activity and the adverse employment action.

Holding the facts in a light most favorable to the Plaintiff, there are sufficient facts to support the Plaintiff's CEPA claim. In other words, a genuine issue of material fact remains as to whether Plaintiff reasonably believed that he was being asked to participate in conduct which violated a law, rule or mandate of public policy, and Plaintiff was retaliated against for refusing to engage in such conduct.

First, Plaintiff alleges that he believed that UPS was violating public policy because UPSers.com and the UPS network were not secure and could expose personal confidential information.  In support of his claim, Plaintiff points to: (1) the fact that the terms and conditions of UPSers.com specifically informed employees that they had no reasonable expectation of privacy when using UPS portals; (2) the fact that for most users, UPSers.com did not have a user authentication system to protect its users' confidential information;[5] and (3) that UPSers.com allowed another individual to be contemporaneously logged on with the same username and password without notifying the user.  Plaintiff alleges that because of concerns over the privacy of his confidential information, he would not use UPSers.com or TMS.

Second, Plaintiff performed a whistle-blowing activity as defined by N.J.S.A. 34:19-3(c)(3). Specifically, Plaintiff "objected to, or refuse[d] to participate in an activity, policy, or practice which. . . [he] believe[d]. . . was incompatible with a clear mandate of public policy concerning the public. . . safety. . . . N.J.S.A. 34:19-3(c)(3). Third, an adverse employment action was taken against Plaintiff -- he was terminated. Lastly, there is a causal nexus between Plaintiff's whistle-blowing activity and his termination. This

---

[5] Select members of Upper Management had access to a user authentication system.

causal nexus is evidenced by Sittig's acknowledgment – in his August 2006 TMS report – that Plaintiff received a 3 out of 6 on his Mission Skills because of Plaintiff's failure to utilize UPS portals. In other words, Plaintiff's performance reviews were directly affected by his refusal to register to UPS portals.

Moreover, there is a substantial causal nexus between the complained of conduct by UPS and a law, rule or mandate of public policy. *Dwonzar*, 177 N.J. at 462. The New Jersey's Identity Theft Protection Act, N.J.S.A. 56:11-44, *et seq.* (2009) ("ITPA") recognizes that many identity crimes "involve the interception of personal financial data or the fraudulent acquisition of credit cards or other financial products in another person's name…" N.J.S.A. 56:11-45 (c). The Legislature, in enacting the ITPA, noted that it is necessary to restrict access to citizens' social security numbers "in order to detect and prevent identity theft and to enact certain other protections and remedies related thereto and thereby further the public safety." N.J.S.A. 56:11-45(h). Additionally, New Jersey courts recognize that citizens have a reasonable expectation and a right to keep identifying information confidential. *See Hirl v. Bank of America*, *N.A.*, 401 N.J. Super. 573 (App. Div. 2008) (noting New Jersey's progressive stance in protecting the confidentiality of bank account records); *State v. McCallister*, 184 N.J. 17 (2005) (holding that, although the U.S. Constitution does not provide for an expectation of privacy of bank account records, the New Jersey Constitution does).

Here, there is clearly a nexus between the complained-of-conduct and the ITPA. Plaintiff alleges that he was retaliated against for refusing to use UPS portals which disclaimed any responsibility for employees' confidential personal information. Plaintiff's objections were in line with New Jersey's laws and public polices with regard

to same. Whether or not Plaintiff actually held such a belief, and whether that belief was objectively reasonable, is a matter for a jury. *Dzwonar* at 464-65. Therefore, Defendants' Motion for Summary Judgment as to Plaintiff's CEPA claim is denied.

**Sittig's Individual CEPA Liability**

Individual defendants may be liable pursuant to CEPA. *See Espinosa v. Continental Airlines*, et al., 80 F. Supp. 2d. 297 (D.N.J. 2000). The court in *Palladino v. VNA of Southern New Jersey*, 68 F. Supp. 2d 455 (D.N.J. 1999), held that individual defendants, "including supervisory employees who act with the authorization of the employer," may be held liable under CEPA.

Defendant Sittig may be individually liable pursuant to CEPA. As discussed supra, this court finds that Plaintiff alleges sufficient facts to support a CEPA claim. Defendant Sittig was Plaintiff's direct supervisor at the time of his termination. The evidence supports the contention that Defendant Sittig was acting with the consent of UPS. It is undisputed that, in May 2006, Sittig contacted HR to see what disciplinary actions he could take against Plaintiff for failing to register to UPSer.com and TMS. It is also undisputed that Sittig rated Plaintiff a 3 out of 6 on Mission Skills in Plaintiff's August 2006 evaluation, partly because Plaintiff failed to utilize UPS portals and Direct Deposit. Additionally, it is undisputed that Sittig played a role in both the October 23, 2006 management meeting to discuss disciplinary actions against Plaintiff for failing to utilize UPS portals and the November 16, 2006 meeting where it was decided to terminate Plaintiff. Moreover, it is undisputed that these acts were authorized by UPS because Sittig's desire to discipline Plaintiff for failing to utilize UPS portals was supported by several members of management and HR. Because Defendant Sittig

individually carried out many of the adverse actions against Plaintiff, this court finds that the facts support a claim of individual CEPA liability against Sittig. Defendants' Motion for Summary Judgment as it pertains to Plaintiff's individual CEPA claim against Sittig is denied.

**FMLA Retaliation claim**

To establish a *prima facie* case of retaliation pursuant to the FMLA, the plaintiff must demonstrate that: "(1) he took  FMLA leave; (2) he suffered an adverse employment decision; and (3) the adverse decision was causally related to his leave." 29 U.S.C. §2615(a)(2); *see also Conoshenti v. Public Service Elec. & Gas Co*., 364 F.3d 135, 146 (3d Cir. 2004).   To demonstrate a causal connection, a plaintiff may present "'direct evidence' that [their] FMLA leave was a substantial factor in the adverse employment action." *Spagnoli v. Brown & Brown Metro, Inc.*, 2007 U.S. Dist. LEXIS 59698, at *45- 46 (D.N.J. Aug. 14, 2007).   Direct evidence is "evidence sufficient to allow the jury to decide that the decision makers placed substantial negative reliance on [the protected activity] in reaching their decision." *Conoshenti,* 364 F.3d at 147 n.10; *citing Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (*quoting Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1988)).   If the plaintiff does not have direct evidence, "timing can be used to infer a causal connection between the leave and the adverse action." *Spagnoli*,  2007 U.S. Dist. LEXIS 59698, at *46; *see also Parker v. Hahnemann Univ. Hosp.,* 234 F. Supp. 2d 478, 492 n.15 (D.N.J. 2002) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-80 (3d Cir. 2000). If the timing of events surrounding the employment action is not "unduly suggestive," the plaintiff may still show causation

through "circumstantial evidence of ongoing antagonism or inconsistent reasons for the action." *Parker*, 234 F. Supp. 2d at 492 n.15.

Here, Plaintiff has established a *prima facie* case of retaliation under FMLA. There is no dispute that Plaintiff took leave under the FMLA or that he suffered an adverse employment action.  However, a genuine issue of material fact exists as to whether a causal connection exists between Plaintiff's FMLA leave and his adverse employment action.  After Plaintiff's 2001 FMLA leave, plaintiff's supervisor[6] stated that employees who take family leave remain "status quo" as to their career progress. Following Plaintiff's 2006 FMLA leave, Plaintiff was placed on a list of "Potentially Overcompensated" employees and singled out as having very difficult family health problems.  Although Plaintiff had different supervisors during his first two FMLA leaves, Sittig acknowledged he was informed by previous management that Plaintiff had taken prior FMLA leaves.  Thus, these facts raise a reasonable inference that Plaintiff's termination was related to his 2001 and 2004 FMLA leaves.

Moreover, UPS contends that management decided to terminate Plaintiff at a meeting on November 16, 2006 prior to Plaintiff leaving sick for the day and the day before Plaintiff sought FMLA leave in November 2006. However, emails between management members indicate that another meeting was to be held before the decision to terminate Plaintiff was finalized.  Additionally, although it is customary to have notes taken at these meetings, Defendants have no documentation from the November 16, 2006 management meeting.  Thus, the facts raise the reasonable inference that Plaintiff's termination, five days after requesting FMLA leave in November 2006, was as a result of Plaintiff's apparent need to take another FMLA leave.

---

[6] His supervisor at that time is unknown.

Plaintiff alleges genuine issues of material facts to support a claim of retaliation under FMLA. Therefore, the Defendant's Motion for Summary Judgment as to Plaintiff's FMLA claim is denied.

**Sittig's Individual FMLA Claim**

Individual liability attaches under the FMLA when a supervisor "exercised control" over plaintiff's FMLA leave. *See Spagnoli*, 2007 U.S. Dist. Lexis 59698 (D.N.J. Aug. 25, 2007); *see also Hewett v. Willingboro Board of Education,* 421 F. Supp. 2d 814, 817-818, n. 4 (D.N.J. 2006) (holding that individual employees can be liable for violations of the FMLA if they are acting on behalf of the employer). The FMLA defines an "employer" as "any person who acts directly or indirectly in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(1).

Here, the record is clear – Sittig was Plaintiff's direct supervisor, he made note of Plaintiff's two previous FMLA leaves, sought to discipline Plaintiff, and ultimately terminated Plaintiff while he was attempting to obtain his third FMLA leave. Thus, a genuine issue of material fact remains as to whether Sittig should be held individually liable for a violation of FMLA. Defendants' Motion for Summary Judgment as it pertains to Plaintiff's individual FMLA claim against Sittig is denied.

**Age Discrimination Claim**

Plaintiff's claim under the NJLAD must fail because it is preempted by the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1144 (2009). ERISA provides that:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III *shall supersede any and all State laws* insofar as they may now or hereafter relate to any employee benefit plan…

13

29 U.S.C. §1144(a) (emphasis added).  Where a plaintiff states a "claim that the employer wrongfully terminated plaintiff primarily because of the employer's desire to avoid contributing to, or paying benefits under, the employee's pension fund [such claim] 'relates to' an ERISA-covered plan… and is therefore preempted." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990); *see also Wood v. Prudential Ins. Co. of America*, 207 F.3d 674, 676-79 (3d Cir. 2000) (finding that "[a] claim of discharge based on a 'benefits-defeating' motive" fails under ERISA).  Here, Plaintiff claims his termination was motivated, in part, by UPS' desire to avoid paying his pension and future medical benefits.  Thus, Plaintiff's NJLAD claim is pre-empted by ERISA.  Accordingly, the Defendant's Motion for Summary Judgment as to the Plaintiff's NJLAD claim is granted.

**Spoliation of Evidence**

Spoliation of evidence is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *MOSAID Techs. Inc. v. Samsung Elecs. Co.*, 348 F.Supp. 2d 332, 335 (D.N.J. 2004).  There are four requirements in order to impose sanctions on a party for spoliation of evidence:

(1) the evidence in question must have been within the alleged spoliator's control;

(2) it must appear that there has been actual suppression or withholding of evidence;

(3) the allegedly spoliated evidence must have been relevant to claims or defenses; and

(4) it must be reasonably foreseeable that the evidence would later be discoverable.

*Sarmiento v. Montclair State Univ.* 513 F. Supp. 2d 72, 94 (D.N.J. 2007), *aff'd* Fed. Appx. 095 (3d Cir. 2008) (*citing*, *inter alia*, *MOSAID*, 348 F. Supp. 2d at 335-36).  The court may use its discretion when imposing a sanction, which may include dismissal of a claim or the granting of a motion for summary judgment in favor of the moving party. *MOSAID*, 348 F. Supp. 2d at 335.

Here, there is significant factual dispute over whether the Plaintiff has intentionally destroyed evidence relevant to his claim for Economic Damages.  The Plaintiff alleges that he applied for several positions but only retained the template cover letter he submitted to several corporations. Simply because the companies Plaintiff allegedly applied to have not produced documentation to show that he applied for employment does not infer that he intentionally suppressed or withheld evidence of same. The record reflects that none of the companies ever denied receiving a resume from the Plaintiff; only that they did not have documentation to produce.  At trial, Defendants will have ample opportunity to examine Plaintiff regarding his efforts to mitigate damages. On the present record, this Court cannot conclude that Plaintiff engaged in any intentional conduct to destroy evidence.  The Defendant's Motion to Dismiss Plaintiff's claim for Economic Damages is denied.

## **CONCLUSION**

For the reasons stated above, Defendants' Motion for Summary Judgment is denied, in part, and, granted, in part.

s/Susan D. Wigenton, U.S.D.J.

Orig:   Clerk
Cc:     Madeline Cox Arleo, U.S.M.J.
            Parties